**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**TYLER JAMES CARTER,**

      **Plaintiff,**

                             **Civil Action 2:14-cv-497**
    **v.**                           **Judge George C. Smith**
                             **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

**REPORT AND RECOMMENDATION**

Plaintiff, Tyler James Carter, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for social security disability insurance benefits and supplemental security income.  This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 11), the Commissioner's Memorandum in Opposition (ECF No. 16), Plaintiff's Reply (ECF No. 17), and the administrative record (ECF No. 10).  For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.  BACKGROUND

Plaintiff filed his applications for benefits in January 2011, alleging that he has been disabled since February 9, 2010, due to a learning disability.[1]  (R. at 167- 70, 171-76, 207.)

---

[1]Plaintiff previously filed for benefits twice, in October 2005 and August 2009.  His prior applications were denied.  (R. at 53, 77, 203.)

Plaintiff subsequently alleged shortness of breath.  (R. at 232.)  Plaintiff's applications were denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.  Administrative Law Judge John L. Shailer ("ALJ") held a hearing on October 30, 2012, at which Plaintiff, represented by counsel, appeared and testified.  (R. at 115–33.)  Richard P. Oestreich, Ph.D., a vocational expert, also appeared and testified at the hearing.  On December 17, 2012, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 9–29.)  On March 28, 2014, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. at 1–5.)  Plaintiff then timely commenced the instant action.

## II.    HEARING TESTIMONY

### A.    Plaintiff's Testimony

Plaintiff testified at the administrative hearing that his reading is "okay" and that he is "not the best reader."  (R. at 41.)  He testified that he has been fired from jobs because he was "having a tough time reading."  (R. at 43.)  Plaintiff acknowledged smoking a half a pack of cigarettes a day.  (R. at 44.)  Plaintiff stated that he takes medication for heartburn and hepatitis and that he also uses an Albuterol inhaler.  (*Id.*)  He said that although he briefly took medication for anxiety, he stopped taking it because it made him "grouchy" and that he had been okay since stopping the medication.  (R. at 44-45.)

Plaintiff further testified that he broke his right arm and that if he holds his arm certain ways it locks up.  (R. at 45-46.)  He estimated that he can lift 25-50 pounds, but that if he carried the weight "for a long time" it would start hurting.  (R. at 46.)  He also testified that he has no problems walking.

Plaintiff testified that his biggest problems on past jobs was telling time, getting clocked in, and reading.  (R. at 46.)  He also stated that he cannot count change very well.  (*Id.*)  Plaintiff indicated that he takes care of his son and helps him with homework, but that he often needs to ask his parents to help with his son's assignments.  (R. at 47.)  Upon cross-examination from his counsel, Plaintiff testified that he had problems staying on task while working.  (R. at 50.)  He estimated that he missed work about three or four times in a month because he or his son was sick.  (*Id.*)

**B.**     **Vocational Expert Testimony**

The vocational expert ("VE") testified at the administrative hearing that Plaintiff's past relevant work included a lumber yard loader and frozen food stocker, both classified as medium, unskilled work.  (R. at 48.)

The VE testified that a hypothetical individual of Plaintiff's age, education, and work experience with an RFC to perform work at all exertional levels and was functionally illiterate could perform Plaintiff's past relevant work.  In response to Plaintiff's counsel's question premised upon the opinion of consulting examiner Albert E. Virgil, the VE further testified that if the hypothetical individual was further limited to one-to-two-step, routine jobs with simple instructions, he would still be able to perform Plaintiff's past relevant work.  Finally, the VE testified that if Plaintiff would miss four days of work a month, he would not be able to sustain employment.  (R. at 50-51.)

3

### III.   EDUCATIONAL RECORDS

While in school, Plaintiff participated in special education classes.  (R. at 479-506.)  In October 1997, when Plaintiff was in the 2nd grade, he received a verbal I.Q. score of 60, performance I.Q. score of 57, and full-scale I.Q. score of 55 on the Wechsler Intelligence Scale for Children-Third Edition ("WISC-III") test.  (R. at 504.)

Plaintiff's Individualized Education Programs ("IEPs") for his high school years focused on developing reading skills, writing skills, math skills, and study skills to function in a classroom, as well as involvment in vocational programs.  (R. at 244-310.)  Plaintiff's IEP for tenth-grade reflected that he was performing at the second-grade level.  (R. at 256.)

### IV.   MEDICAL RECORDS

**A.     Physical Impairments**

**1.     Teresa Tenpenny, M.D.**

The record contains Dr. Tenpenny's treatment notes from August 2006 until August 2011.  (R. at 507-632, 662-69, 681-97.)

In 2009, Plaintiff was treated for asthma (R. at 517), chronic low-back pain (R. at 509), and right wrist pain.  (R. at 514, 517-18.)  In December 2009, Plaintiff reported that due to pain in his right wrist he is unable to drive some days.  Dr. Tenpenny noted Plaintiff had a normal mood, affect, behavior, and thought content.  (R. at  663.)  Plaintiff was referred to a specialist for his wrist and prescribed pain medication to treat his low-back pain.  (*Id.*)

In November 2010, Plaintiff reported that he was laid off from his last job due to missing work because of child care problems.  Plaintiff rated his back pain severity at a level of 10 "sometimes" on a 0-10 visual analog scale.  He denied any problems with nausea, vomiting, or

4

diarrhea.  Dr. Tenpenny prescribed Albuterol for his asthma.  Given his exposure to Hepatitis C, Dr. Tenpenny also ordered an acute hepatitis panel.  (R. at 665-66.)

On May 2, 2011, Plaintiff complained of a knot on his right-side after lifting an elderly person.  Dr. Tenpenny noted he was alert and oriented, and had normal mood, affect, behavior, judgment, and thought content.  (R. at 682-83.)

Plaintiff was seen for follow-up for Hepatitis C on August 26, 2011.  He reported that both his back and stomach hurt.  He also indicated that he had trouble sleeping and heartburn.  Dr. Tenpenny noted that Plaintiff's mental status examination was unchanged and that his lungs and abdomen were normal.  She referred Plaintiff to gastroenterology.  (R. at 690-92.)

In October 2012, Dr. Tenpenny opined that Plaintiff could never climb, stoop, crouch, kneel, or crawl, and could only occasionally balance due to pain.  Dr. Tenpenny also opined that Plaintiff could only stand/walk for two-to-three hours out of an eight-hour workday and that he could only stand or walk for a total of twenty minutes without interruption.  She found that Plaintiff did not have any limitations sitting.  Dr. Tenpenny further opined that Plaintiff could only lift for up to one-third of a day because he experienced back pain after fifteen-to-twenty minutes of lifting.  (R. at 719-22.)  She identified Plaintiff's right-arm fracture and his complaints of low-back pain as the "medical findings" that supported her assessment.  (R. at 719.)

### 2.    Holzer Clinic

MRIs of Plaintiff's lumbar spine and thoracic spine from December 2005 were normal. (R. at 425, 431-32.)

Plaintiff treated twice in 2006 with Todd Rubley, D.C., at the Holzer Clinic for chiropractic treatment due to his neck pain and mid- and low-back pain.  (R. at 419, 422.)  In January 2006, Plaintiff reported he was hanging drywall over the weekend.  (R. at 422.)

Plaintiff was seen in emergent care in June 2009 for low-back pain.  He reported that he had injured his back years ago from a bicycle accident.  He was out of his medication and missed his appointment the day prior.  A straight leg raising test was normal.  Plaintiff was prescribed Ultram.  (R. at 397.)  X-rays of the cervical, thoracic, and lumbar spines were normal.  (R. at 398-400.)

### 3.    State-Agency Evaluation

In an undated report, a state-agency reviewing physician found that Plaintiff did not have a severe physical impairment.  (R. at 660.)  The reviewer noted Plaintiff's normal x-rays and examinations, as well as Plaintiff's allegations that he is able to do everything he used to so long as he gives his right arm a break and that he could lift his son who weighed between 35-40 pounds at the time.  (*Id*.)  State-agency reviewing physician Marie Congbalay, M.D., reviewed the record on October 13, 2011, and also found that the record contains no evidence of a physical impairment so severe as to affect Plaintiff's ability to work.  (R. at 81-82, 93-94.)

## B.    Mental Impairments

### 1.    Alan White, Ph.D.

Plaintiff was psychologically evaluated by Dr. White in November 2009 as part as his previous applications for benefits.  (R. at 651-57.)  Dr. White noted Plaintiff was cooperative, friendly, timid, and polite and that his eye contact was direct with an alert facial expression.  Dr. White described his social skills as within the average range and noted that Plaintiff's speech

was coherent and relevant.  Plaintiff was able to maintain attention throughout the interview.  (R. at 652.)  Dr. White described Plaintiff's affect as reflective.  Dr. White noted that Plaintiff did not display overt signs of anxiety such as restlessness or fidgetiness.  Plaintiff was alert and oriented to person, place, date and situation.  He could state his age, Social Security Number, what meals he ate the previous day, what television shows he watched the previous day, the name of his high school, and the year he graduated from high school.  On digit span, Plaintiff was able to recall 4 digits forwards and 4 digits backwards, but could not perform serial 7 subtraction task or serial 3 subtraction task.  He could spell the word "world" forward and backward.  (R. at 653.)

As to his activities of daily living, Plaintiff reported that in the mornings and afternoons, he takes care of his child, takes his medication, and smokes cigarettes.  In the evenings, he eats dinner and watches television.  He helps with some of the household duties such as the child raising, cooking, and heavy lifting.  His wife and mother take care of the dishes, house cleaning, and shopping.  Plaintiff reported that he is able to feed, bathe, and dress himself without assistance.  He reported daily socialization with family members and occasional socialization with friends.  Plaintiff indicated that he has a driver's license.  (R. at 653.)

I.Q. testing revealed a verbal comprehension index score of 74, a perceptual reasoning index score of 75, a working memory index score of 77, a processing speed index score of 81 and full-scale I.Q. score of 72 on the Wechsler Adult Intelligence Scale-Fourth Edition ("WAIS-IV").  (R. at 654, 657.)

Dr. White assessed an Axis II classification of borderline intellectual functioning.  (R. at 655.)  Dr. White opined that Plaintiff was not impaired in his ability to relate to others, including

fellow works and supervisors.  He further found that Plaintiff's ability to understand, remember and follow instructions was not impaired.  (R. at 655.)  Dr. White opined that Plaintiff was mildly impaired in his mental ability to maintain attention, concentration, persistence, and pace to perform routine tasks due to limited cognitive abilities and also that he was mildly impaired in his ability to withstand the stress and pressures associated with day-to-day work activity due to borderline intellectual functioning.  (R. at 655-56.)

In May 2011, Plaintiff was psychologically evaluated by Dr. White for his current application for benefits.  (R. at 670-75.)  At this evaluation, Dr. White reported that Plaintiff's appearance and hygiene were adequate; he was friendly and business like; he was alert and smiling with direct eye contact; and his affect was blunted.  He noted that Plaintiff did not display overt signs of anxiety such as restlessness or fidgetiness.  He was alert and oriented to person, place, date, and situation.

Plaintiff recalled 5 digits forwards and backwards, but could not perform serial 3 or 7 tasks.  Dr. White again assessed no Axis I diagnosis and a Axis II classification of borderline intellectual functioning.  (R. at 673.)  Dr. White opined that Plaintiff's ability to remember, understand and follow directions was not impaired; his ability to maintain attention and sustain concentration, persist at tasks, complete tasks in timely manner was not impaired; his abilities in social interaction were not impaired; and his stress tolerance was mildly impaired.  (R. at 674-75.)

### 2.    Albert E. Virgil, Ph.D.

On July 18, 2012, Dr. Virgil also consultatively evaluated Plaintiff for disability.  (R. at 698-706.)  Plaintiff reported he was disabled because he has a hard time learning things.  (R. at

702.)  As to his activities of daily living, Plaintiff takes care of his six-year-old son, he can cook and shop independently, he takes his son fishing and sometimes hangs out with one friend.  (R. at 703.)  Plaintiff reported that went to jail in 2009 for domestic violence.  On mental status examination, Dr. Virgil found Plaintiff related in a passive manner with appropriate responses. He noted that Plaintiff's speech was generally understandable, but that he does present with a speech impairment.  Dr. Virgil noted that Plaintiff comprehended and carried out instructions and tasks.  His affect and mood were normal, he did not present depressed.  (R. at 703.)  Dr. Virgil noted that Plaintiff "presents with marginally adequate ability to make sound, common sense judgments."  (R. at 704.)

Testing under the Wide Range Achievement Test-Fourth Edition ("WRAT-IV") for word reading, sentence comprehension, spelling, and math computation placed Plaintiff's abilities between second- and third-grade levels.  (R. at 704.)

Dr. Virgil opined that Plaintiff's presentation during the examination suggests that he was able to interact adaptively with co-workers and respond appropriately to pressures in a work setting commensurate with his ability level.  Dr. Virgil also found Plaintiff was cooperative and appeared amenable to supervision and that his attention and concentration skills appeared to be consistent with his overall ability level and that he should be able to perform multi-step tasks. (R. at 705.)

Dr. Virgil also completed a medical source statement worksheet in which he checked boxes reflecting that Plaintiff had marked limitations in understanding, remembering, and carrying out complex instructions; in making judgments on complex work-related decisions; and in his ability to respond appropriately to usual work situations and to changes in a routine work

9

setting.  (R. at 698-700.)  Dr. Virgil stated that his worksheet findings were based on Plaintiff's "Early Elementary grade level achievement scores."  (R. at 698–99.)

### 3.    State-Agency Evaluation

On June 5, 2011, after review of Plaintiff's medical record, Roseann Umana, Ph.D., a state-agency psychologist, assessed Plaintiff's mental condition and opined that he had mild restrictions in his activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of an extended duration.  (R. at 59.)  Dr. Umana did not give weight to Dr. White's conclusions, finding that although Dr. White "opines no to mild impairments, it may be inferred that being of borderline intellectual functioning does cause mild to moderate impairments in daily functioning."  (R. at 60.)  Dr. Umana found Plaintiff partially credible, noting that "[w]hile he may be functionally illiterate, and be of borderline intellectual functioning, he performs many [household] tasks [and] these conditions, while severe are not disabling in severity." (*Id.*)  Dr. Umana concluded that Plaintiff could understand, remember, and carry out simple instructions and some that were more complex.  (R. at 62.)

On November 5, 2011, state-agency psychologist, Leslie Rudy, Ph.D., reviewed the file and found that Plaintiff had moderate difficulties in maintaining concentration, persistence, or pace.  (R. at 82.)  Dr. Rudy affirmed the remaining of Dr. Umana's findings.  (R. at 83-85.)

### V.    ADMINISTRATIVE DECISION

On December 17, 2012, the ALJ issued his decision.  (R. at 9–29.)  The ALJ found that Plaintiff met the special earnings requirements of the Act through June 30, 2010.  (R. at 14.)  At

step one of the sequential evaluation process,[2] the ALJ found that Plaintiff had not engaged in

substantially gainful activity since his alleged onset date of February 9, 2010.  (*Id.*)  The ALJ

found that Plaintiff had the severe impairments of a learning disorder and borderline intellectual

functioning.  (*Id.*)  He further found that Plaintiff did not have an impairment or combination of

impairments that met or medically equaled one of the listed impairments described in 20 C.F.R.

Part 404, Subpart P, Appendix 1.  (R. at 18-23.)  At step four of the sequential process, the ALJ

that Plaintiff has the residual functional capacity ("RFC") to perform a full range of work at all

exertional levels without physical limitation or restriction.  With regard to mental restrictions,

the ALJ found that Plaintiff was functionally illiterate.  (R. at 23.)  The ALJ found Plaintiff's

impairments could reasonably be expected to cause the alleged symptoms, but that his statements

concerning the intensity, persistence, and limiting effects of these symptoms were not credible to

the extent they were inconsistent with the RFC assessment he found.  (R. at 24.)  The ALJ stated

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. § 416.920(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.  Is the claimant engaged in substantial gainful activity?
2.  Does the claimant suffer from one or more severe impairments?
3.  Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4.  Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5.  Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

that he based Plaintiff's RFC on the opinions of the state-agency physicians and psychologists. (R. at 16-17, 25.)  The ALJ assigned no weight to Dr. Tenpenny's opinion.  (R. at 17.)  The ALJ assigned "great" weight to the opinions of the consultative psychologists, Drs. White and Virgil. (R. at 26.)  Relying on the VE's testimony, the ALJ concluded that Plaintiff can perform his past relevant work.  (R. at 28-29.)  He therefore concluded that Plaintiff was not disabled under the Social Security Act from February 9, 2010, through the date of the decision.  (R. at 29.)

## VI.   STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'"  *Blakley*

*v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VII.   ANALYSIS

In his Statement of Errors, Plaintiff asserts that the ALJ erred in failing to properly weigh the opinion evidence.  Plaintiff also challenges the ALJ's RFC determination, asserting that the ALJ should have performed a function-by-function analysis and included additional limitations to account for Plaintiff's severe impairments.  The Undersigned considers these contentions of error in turn.

### A.    Weighing of the Opinion Evidence

Within this contention of error, Plaintiff challenges the ALJ's consideration and weighing of the opinions of treating physician Dr. Tenpenny and examining consultant Dr. Virgil.

The ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case.  20 C.F.R. § 416.927(c).  The applicable regulations define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 416.927(a)(2).

13

The ALJ generally gives deference to the opinions of a treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unI.Q.ue perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . ." 20 C.F.R. § 416.927(c)(2); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009). If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic technI.Q.ues and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

> [A]n ALJ must apply certain factors-namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source-in determining what weight to give the opinion.

*Id*. Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 416.927(c)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550

(6th Cir. 2010) (internal quotation omitted).  The United States Court of Appeals for the Sixth

Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the
> disposition of their cases," particularly in situations where a claimant knows that his
> physician has deemed him disabled and therefore "might be especially bewildered
> when told by an administrative bureaucracy that she is not, unless some reason for
> the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999).
> The requirement also ensures that the ALJ applies the treating physician rule and
> permits meaningful review of the ALJ's application of the rule. *See Halloran v.
> Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45.  Thus, the reason-giving requirement is "particularly important

when the treating physician has diagnosed the claimant as disabled."  *Germany-Johnson v.

Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242).

There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors

within the written decision.  *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir.

2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to

explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical

opinion evidence within the written decision).

    Regardless of the source of a medical opinion, in weighing the opinion, the ALJ must

apply the factors set forth in 20 C.F.R. § 416.927(c), including the examining and treatment

relationship, supportability of the opinion, consistency of the opinion with the record as a whole,

and the specialization of the source.  In addition, the regulations provide that where, as here, the

ALJ does not assign controlling weight to the claimant's treating physician, he or she must

explain the weight assigned to the opinions of the medical sources:

> Unless a treating source's opinion is given controlling weight, the administrative law
> judge must explain in the decision the weight given to the opinions of a State agency
> medical or psychological consultant or other program physician, psychologist, or

15

> other medical specialist, as the administrative law judge must do for any opinions
> from treating sources, nontreating sources, and other nonexamining sources who do
> not work for us.

20 C.F.R. § 416.927(e)(2)(ii). Where an ALJ's opinion satisfies the goal of § 416.927 and is

otherwise supported by substantial evidence, the failure to explicitly provide the weight assigned

is harmless. *See, e.g.*, *Pasco v. Comm'r of Soc. Sec.,* 137 F. App'x 828, 839 (6th Cir. 2005)

(harmless error where the ALJ failed to mention or weigh the report of consultative neurologist

who only evaluated plaintiff once and was not a treating source); *Dykes v. Barnhart*, 112 F.

App'x 463, 467–69 (6th Cir. 2004) (failure to discuss or weigh opinion of consultative examiner

was harmless error); *cf. Friend*, 375 F. App'x at 551 (explaining that the treating physician rule

"is not a procrustean bed, requiring an arbitrary conformity at all times. If the ALJ's opinion

permits the claimant and a reviewing court a clear understanding of the reasons for the weight

given a treating physician's opinion, strict compliance with the rule may sometimes be

excused.").

Finally, the Commissioner reserves the power to decide certain issues, such as a

claimant's residual functional capacity. 20 C.F.R. § 404.1527(d). Although the ALJ will

consider opinions of treating physicians "on the nature and severity of your impairment(s),"

opinions on issues reserved to the Commissioner are generally not entitled to special

significance. 20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

Applied here, the Undersigned finds that the ALJ did not err in his consideration and

rejection of Dr. Tenpenny's opinion. The ALJ recognized that Dr. Tenpenny was Plaintiff's

primary care physician, but assigned her opinions regarding Plaintiff's physical limitations "no

weight," reasoning as follows:

16

The physical limitations assessed by [Dr. Tenpenny] from October 2012 are entitled to no weight. These opinions are inconsistent with the objective medical evidence, including Plaintiff's treatment records, which reflect that [Plaintiff] was neurologically and vascularly intact upon repeated physical examinations, with normal or good balance, coordination, cranial nerves, motor bulk, power, strength and tone, range of motion, pulses, reflexes, sensory, gain, and station. These opinions are also inconsistent with [Plaintiff's] longitudinal history of performing physically strenuous activities and his admitted abilities for lifting, carrying, sitting, standing, and walking, as also discussed above. Accordingly, the physical limitations assessed in this case by [Dr. Tenpenny] from October 2012 are entitled to no weight in this case.

(R. at 17 (internal citations to the record omitted).) The ALJ also discussed at length the record evidence upon which he relied to reject Dr. Tenpenny's opinion and to instead find that no exertional limitations were warranted:

There is no evidence of limitations attributable to [Plaintiff's] physical conditions. The only straight leg rasing test results in this case were normal. [Plaintiff] did not demonstrate muscles atrophy or weakness or extremity edema or deformity upon repeated physical examinations. [Plaintiff] was neurologically and vascularly intact upon repeated physical examinations with good or normal balance, coordination, cranial nerves, motor bulk, power, strength and tone, pulses, sensory, reflexes and strength, tone and range of motion in all muscles, joints and extremities. There is no evidence that [Plaintiff] requires assistive devises such as braces, crutches, splints, or a cane, walker or transcutaneous electrical nerve stimulator ("TENS") unit in order to ambulate effectively. [Plaintiff] was repeatedly ambulatory with normal gait on his heels and toes, and no ataxia. [Plaintiff] can admittedly lift and carry up to 35-40 pounds without difficulty and has no problem sitting, standing, and walking. [Plaintiff] had normal Romberg and McMurray signs at different times. [Plaintiff] had normal manipulative abilities for using zippers and buttons. [Plaintiff] had normal x-ray and/or magnetic resonance imaging ("MRI") scan results of his cervical, lumbar, and thoracic spine, knees, left index finger and right ankle and wrist at different times. There is no evidence of bowel or bladder incontinence. Accordingly, there is no evidence of physical limitation in this case.

The evidence also reflects that [Plaintiff's] physical impairments and alleged symptoms are not sufficiently severe to preclude him from engaging in a number of strenuous activities since the alleged onset of disability. [Plaintiff] described performing heavy household lifting at different times. As discussed below, [Plaintiff] also described engaging in other physically strenuous activities such as lifting weights, hanging drywall, lifting elderly people, helping with baby goats, cutting firewood, hunting, and fishing. [Plaintiff's] pursuit and performance of such

17

strenuous activities is inconsistent with restrictions on his ability to work attributable
to his physical conditions.

(R. at 15–16 (internal citations to the record omitted).)  Citing to various records, the ALJ also

noted that the record evidence reflected that Plaintiff's physical impairments and symptoms were

"stable, tolerable, and well controlled with prescribed treatment."  (R at 16.)

The Undersigned finds that the reasons the ALJ offered for rejecting Dr. Tenpenny's

opinions constitute good reasons.  *See* 20 C.F.R. § 416.927(c) (citing supportability and

consistency of the opinion with the record as a whole).  Moreover, substantial evidence supports

the ALJ's conclusions concerning the consistency and supportability of Dr. Tenpenny's opinion.

Review of Dr. Tenpenny's opinion reflects that she premised her limitations upon Plaintiff's

alleged low-back pain.  Review of Plaintiff's treatment notes, however, reflect that every single

examination, diagnostic test, x-ray, and MRI reflect normal findings.  And as the ALJ points out,

Plaintiff's own testimony, as well as the record evidence reflecting his daily activities, are

inconsistent with the severe limitations Dr. Tenpenny opined.  Finally, the state-agency

reviewing physicians found that the record contains no evidence of a physical impairment so

severe as to affect Plaintiff's ability to do work.  (R. at 81–82, 93–94.)

The Undersigned further finds that to the extent the ALJ erred in assessing Dr. Virgil's

opinion, the error was harmless.  Citing to the exhibit reflecting Dr. Virgil's opinion, the ALJ

discussed his opinion throughout the decision as follows:

> The second consultative psychologist opined that [Plaintiff's] mental ability
> to respond appropriately to supervision and co-workers in a work setting is not
> impaired.

\*       \*       \*

18

> The second consultative psychologist opined that [Plaintiff's] mental abilities to understand, remember and carry out instructions, maintain attention and concentration and maintain persistence and pace to perform simple and multi-step tasks and respond appropriately to work pressures in a work setting are not impaired.

(R. at 20, 21.)  The ALJ accepted and adopted the opinions of consulting examiners Drs. White and Virgil.  (*Id.*)

Plaintiff maintains that if the ALJ had adopted the opinion of Dr. Virgil, then he would have included greater mental limitations into his RFC assessment to account for the boxes Dr. Virgil checked on the Medical Source Statement worksheet that he completed contemporaneously with his submission of his narrative report.  More specifically, Plaintiff points out that Dr. Virgil checked "marked" next to the boxes relating to his ability to understand, remember, and carry out complex instructions; his ability to make judgment on complex work-related decisions; and his ability to respond appropriately to usual work situations and changes in routine work setting.  (Pl.'s Statement of Errors 8, ECF No. 11.)

The Undersigned finds that the ALJ did not err in relying upon the narrative portion of Dr. Virgil's opinion or in failing to address or adopt the check-the-box portion.  An ALJ is not required to analyze or incorporate checked boxes on a worksheet portion of a mental functional capacity assessment.  As the United States Court of Appeals for the Sixth Circuit recently explained, the check-the-box portion "is merely a worksheet and does *not* constitute the RFC assessment."  *Griffith v. Comm'r of Soc. Sec.*, 582 F. App'x 555, 563 (6th Cir. 2014) (quoting POMS DI 24510.060 Mental Residual Functional Capacity Assessment)).  The medical source must explain his or her conclusions indicated in the worksheet portion in the narrative section "in terms of the extent to which these mental capacities or functions could or could not be performed in work settings."  *Id.*  Here, in his written opinion, Dr. Virgil did not set forth any workplace

limitations on Plaintiff's mental capacities. Accordingly, the ALJ's decision was consistent with the narrative portion of Dr. Virgil's assessment. (R. at 705–06.)

Moreover, to the extent the ALJ erred in not finding greater limitation based upon the boxes Dr. Virgil checked on the worksheet, commonsense dictates a finding of harmless error given that Dr. Virgil identified Plaintiff's early elementary grade-level achievement scores as the only basis for his worksheet findings. (*See* R. at 698–99.) Notwithstanding his early elementary grade-level achievement scores, Plaintiff was able to perform his past employment. And as noted above, the ALJ found that Plaintiff was not disabled because he could perform his past work. Thus, at least with regard to his past employment, Dr. Virgil's opinions of impairment flowing from Plaintiff's early elementary grade-level achievement scores are inconsequential.

Finally, even if Dr. Virgil's worksheet findings translated into RFC limitations relating to Plaintiff's ability to perform jobs with complex instructions, the ALJ's failure to include such limitations into his RFC determination is harmless. As discussed above, in response to Plaintiff's counsel's question premised upon the worksheet portion of Dr. Virgil's opinion, the VE testified that a hypothetical individual of Plaintiff's age, education, and work experience and with the RFC the ALJ ultimately found, could still perform Plaintiff's past relevant work even if he was further limited to one-to-two-step, routine jobs with simple instructions. (R. at 49.) Thus, inclusion into the RFC of the limitations Plaintiff's counsel maintains flow from the worksheet portion of Dr. Virgil's opinion would not change the ALJ's ultimate finding that Plaintiff is not disabled because he can perform his past employment.

Accordingly, it is **RECOMMENDED** that the Court find Plaintiff's challenges to the ALJ's weighing of the opinion evidence to be without merit.

20

**B.    RFC Determination**

According to Plaintiff, the ALJ failed to adequately articulate the bases for his RFC

determination and further failed to adequately account for the severe impairments of learning

disorder and borderline intellectual functioning he found at step two of the sequential evaluation.

Citing *Ealy v. Commissioner of Social Security*, 594 F.3d 504 (6th Cir. 2010), Plaintiff contends

that the sole limitation of "functionally illiterate" cannot accommodate the moderate limitations

in maintaining concentration, persistence, or pace that the ALJ found.

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and

mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x

149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The determination of

RFC is an issue reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e), 416.927(e). In

formulating an RFC, an ALJ is only required to incorporate those limitations he or she finds

credible. *See, e.g.*, *Irvin v. Soc. Sec. Admin.*, 573 F. App'x 498, 502 ("Because the ALJ found

that [the medical source's] assessment of [the claimant's] limitations was not credible, he was

not required to incorporate the limitations assessed by her into his RFC determination." (citing

*Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

An ALJ is required to explain how the evidence supports the limitations that he or she set

forth in the claimant's RFC:

> The RFC assessment must include a narrative discussion describing how the
> evidence supports each conclusion, citing specific medical facts (e.g., laboratory
> findings) and nonmedical evidence (e.g., daily activities, observations). In assessing
> RFC, the adjudicator must discuss the individual's ability to perform sustained work
> activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours
> a day, for 5 days a week, or an equivalent work schedule), and describe the
> maximum amount of each work-related activity the individual can perform based on
> the evidence available in the case record. The adjudicator must also explain how any

material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

S.S.R. 96–8p, 1996 WL 374184, at *6–7 (internal footnote omitted).

The Undersigned further finds that the ALJ did not commit reversible error with regard to articulating the bases for his RFC determination.  Following a thorough discussion, the ALJ concluded that Plaintiff had no restrictions in his activities of daily living and no difficulties in social functioning.  (R. at 18–19.)  The ALJ further found that Plaintiff had moderate difficulties with regard to concentration, persistence, or pace.  The ALJ discussed this finding as follows:

> Despite [Plaintiff's] I.Q. scores and history of special education, he graduated from high school and stated at different times that he reads, writes, speaks, and understands English.  The evidence reflects that [Plaintiff] earned good grades in high school.  [Plaintiff] repeatedly presented as alert, awake, and oriented.  [Plaintiff] had clear speech and intact and normal insight, judgment, and thought content and responded to commands at different times.  [Plaintiff] was businesslike with direct eye contact at the first two psychological consultative examinations.  [Plaintiff] also had coherent and relevant speech and maintained attention throughout on both occasions.  [Plaintiff] was alert and oriented on both occasions, with clear 100% intelligible speech.  [Plaintiff] knew his age, Social Security Number, high school, year of high school graduation, and the meals he consumed and television shows he watched the day before at these times.  [Plaintiff] accurately recalled four digits forward and backward and correctly spelled the word "world" backward at the first consultative examination.  [Plaintiff] completed all paperwork independently and without difficulty, had steady and thorough perseverance, accurately recalled five digits forward and backward, interpreted three of four proverbs, answered four of four WAIS-IV test items correctly and spelled a five-letter word forward and backward at the second consultative examination.  [Plaintiff] responded appropriately with coherent and logical thought content and generally intelligible speech at the third consultative examination.  [Plaintiff] comprehended and carried out instructions and tasks at that time.  [Plaintiff] knew the date, city of examination and current President of the United States at that time.  [Plaintiff] correctly recited the alphabet and counted to 20 by twos a that time.  [Plaintiff] had intact recent and remote memory at that time, accurately recalling four digits forward and three digits backward.  As noted above, the evidence reflects that [Plaintiff] shops in stores on a monthly basis.  [Plaintiff] engages in activities that require significant extended attention and concentration such as lifting weights, hanging drywall, hunting and fishing.  [Plaintiff] maintains sufficient attention and concentration to spend a significant amount of time each day watching television.  [Plaintiff] uses telephones

independently and without difficulty. [Plaintiff] performs money management activities such as paying bills. In this context it is noteworthy that [Plaintiff] understood and followed the hearing proceedings closely and fully without any appreciable difficulty and responded to questions in an appropriate manner.

The BDD reviewing psychologists determined initially that [Plaintiff] has mild and upon reconsideration that he has moderate difficulties with regard to concentration, persistence, and pace. The first consultative psychologist opined that [Plaintiff's] mental ability to understand, remember, and follow instructions is not impaired. The first consultative psychologist also opined that [Plaintiff] has no or mild impairment of his mental ability to maintain concentration, persistence, and pace to perform simple and multi-step tasks. The first consultative psychologist also opined that [Plaintiff's] mental ability to withstand and respond appropriately to work pressure in a work setting and the pressure associated with day-to-day work activity is mildly impaired. The second consultative psychologist opined that [Plaintiff's] mental abilities to understand, remember and carry out instructions, maintain attention and concentration, and maintain persistence and pace to perform simple and multi-step tasks and respond appropriately to work pressures in a work setting are not impaired. The consultative psychologists's opinion are most consistent with the totality of the evidence, which reflects little or no difficulty sustaining focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings and could support a determination that he has no or only mild difficulties with regard to concentration, persistence, and pace. However, in extending the benefit of all reasonable doubt, the BDD assessments are accepted and adopted with regard to [Plaintiff's] concentration, persistence, and pace. Accordingly, it is determined that [Plaintiff] has moderate difficulties with regard to concentration, persistence, and pace.

(R. at 20–21 (internal citations to the record omitted).) Thus, the ALJ made clear that although he found that the consulting psychologists Drs. White and Virgil's opinions that Plaintiff was not impaired beyond his functional illiteracy most consistent with the evidence, he nevertheless adopted the opinions of reviewing psychologists Drs. Umana and Rudy. The ALJ's discussion of the evidence and clear identification of the opinion evidence he relied upon in formulating the RFC allows for sufficient review. Accordingly, the Undersigned finds that ALJ did not err with regards to articulating the bases for his RFC determination.

23

The ALJ's failure to include additional limitations into the RFC to account for the moderate difficulties in concentration, persistence, or pace that he found amounts to harmless error.  The ALJ explicitly stated that he found that Plaintiff had these moderate difficulties based upon his adoption of the opinions of reviewing psychologists Drs. Umana and Rudy.  Reviewing psychologist Dr. Umana stated that "[w]hile [Plaintiff] may be functionally illiterate and be of borderline intellectual functioning, he performs many [household] tasks [and] these conditions, while severe, are not disabling in severity."  (R. at 60.)  She found that Plaintiff was moderately limited in his ability to understand and carry out detailed instructions.  (R. at 61.)  She explicitly noted, however, that there was "[n]o evidence of limitation" in Plaintiff's ability to perform activities within a schedule, maintain regular attendance, or be punctual and also that he was "[n]ot significantly limited in his ability to maintain concentration for extended periods."  (*Id.*)  In narrative form, Dr. Umana opined that Plaintiff is "able to understand, remember, and carry out simple instructions and some that are more complex."  (R. at 62.)  Reviewing psychologist Dr. Rudy agreed with Dr. Umana's findings and narrative limitations and noted that in addition to performing household tasks, Plaintiff was able to recall five digits forward and backwards, care for a child, and drive.  (R. at 83–85.)  Thus, based upon his adoption of the opinions of Drs. Umana and Rudy, in addition to his limitation of functional illiteracy, the ALJ should have added a limitation indicating that Plaintiff is "able to understand, remember, and carry out simple instructions and some that are more complex."  (*See* R. at 62, 85.)  But as discussed above, the omission of this additional limitation is harmless given the VE's testimony that Plaintiff's past relevant work could still be performed if the hypothetical individual was further limited one-to-two-step, routine jobs with simple instructions.  (*See* R. at 49.)

Contrary to Plaintiff's assertion, *Ealy* does not require a different result.  More specifically, *Ealy* does not mandate the inclusion of limitations beyond those posed to the VE based upon a finding of moderate impairment in concentration, persistence, or pace where the record does not otherwise support additional limitations.  On this point, *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426 (6th Cir. 2014), is instructive.  The *Smith-Johnson* Court analyzed this argument as follows:

> Smith–Johnson's first challenge concerns her concentration, persistence, or pace.  She relies on *Ealy*, 594 F.3d 504, to support her argument that more specific limitations should have been included in the hypothetical to the VE.  Yet, *Ealy* is distinguishable from this case.  In *Ealy*, the claimant's doctor limited him to "simple, repetitive tasks [for] [two-hour] segments over an eight-hour day where speed was not critical."  *Ealy*, 594 F.3d at 516.  In that RFC assessment, however, the ALJ included only a limitation to "simple repetitive tasks and instructions in nonpublic work settings."  *Id*.  That RFC finding was included in the hypothetical to the VE.  *Id*.  This court held that the RFC assessment and the hypothetical did not adequately reflect the claimant's limitations because it truncated the doctor's specific restrictions.  *Id*.
>
> Here, the limitation to simple, routine, and repetitive tasks adequately conveys Smith–Johnson's moderately-limited ability "to maintain attention and concentration for extended periods."  Unlike in *Ealy*, Dr. Kriauciunas did not place any concrete functional limitations on her abilities to maintain attention, concentration, or pace when performing simple, repetitive, or routine tasks.  Instead, Dr. Kriauciunas plainly determined that Smith–Johnson could perform simple tasks on a "sustained basis," even considering her moderate limitations in maintaining concentration and persistence for "extended periods."  In other words, the limitation to simple tasks portrays the tasks that she can perform without being affected by her moderate limitations.  The ALJ thus did not fail to include a restriction on her ability to maintain concentration, persistence, or pace while performing simple tasks, and he further reduced the required attention and concentration by restricting her to routine and repetitive tasks.

579 F. App'x at 436–37.  Here, no medical source found functional limitations on Plaintiff's ability to maintain pace when performing simple, repetitive, or routine tasks.  Consulting examiner Dr. White diagnosed Plaintiff with borderline intellectual functioning based upon his

25

testing results, but found that he had no or only mild impairment as a result of it. (R. at 651–56.) Similarly, consulting examiner Dr. Virgil found that Plaintiff had a learning disorder based upon his testing results and borderline intellectual functioning, but beyond Plaintiff's inability to read, spell, and compute math beyond a second- or third-grade level, he likewise found no limitations within the narrative portion of his functional assessment. (R. at 698–706.) And the opinions of reviewing psychologists Drs. Umana and Rudy, the opinions the ALJ adopted, explicitly indicated that the record contained "[n]o evidence of limitation" in Plaintiff's ability to perform activities within a schedule, maintain regular attendance, or be punctual and also that he was "[n]ot significantly limited in his ability to maintain concentration for extended periods." (R. at 61, 84.) Accordingly, the ALJ did not err in failing to include mental limitations beyond limiting Plaintiff to one-to-two-step, routine jobs with simple instructions.

In sum, the ALJ sufficiently articulated his bases for his RFC determination. Although the ALJ erred in failing to include a limitation into the RFC indicating that Plaintiff is "able to understand, remember, and carry out simple instructions and some that are more complex" as opined by Drs. Umana and Rudy (R. at 61, 85), the error was harmless in view of the VE's testimony that the hypothetical individual could perform Plaintiff's past employment if the individual was limited to one-to-two-step, routine jobs with simple instructions. *Ealy* does not mandate a different result under the record in this case.

Accordingly, it is **RECOMMENDED** that the Court find Plaintiff's challenges to the ALJ's RFC determination to be without merit.

## VIII.    CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits.  Accordingly, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner of Social Security's decision.

## IX.    PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to

27

specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date:  August 17, 2015                                    ____/s/ *Elizabeth A. Preston Deavers*_____
                                                                          Elizabeth A. Preston Deavers
                                                                          United States Magistrate Judge